May it please the court, Steve Berman on behalf of the Snohomish Public Utility District. During the period of time covered by this case, the defendants in this case were unfettered by the filing of any rates or any pre-approval of their rates by FERC. In that environment, they were able to raise and fix prices to unheard of and unprecedented levels. But isn't that a consequence of shifting from the old system of establishing rates and going to a market-based system? Well, it's a consequence, according to the allegations of the complaint, Judge Tallman, of the defendants getting together and conspiring. No, that's not my question. Didn't FERC change the process or procedure by which it approved wholesale electrical rates? FERC did. And as I'd like to point out, and, in fact, the crux of our argument is that under MCI v. AT&T, when FERC changed the way rates were filed from the old system to the new system, FERC acted inconsistently with Section 205 of the Federal Power Act. In MCI v. AT&T, where the commission, the FCC, had given people the option of filing rates, the Court said it's not up to the agency to change the way rates are filed. It's up to Congress. In this case, our primary argument is that because the filed rates did not comply with Section 205, they did not contain the rates, they did not fix the rates, there was no valid rate. Is your argument then that the commission was without authority or that the approval of the new system was somehow null and void under 205? Is that your theory? Well, in part, yes. Our argument is that, very simply, the statute required rates to be filed in a certain way. And they weren't filed that way. FERC had no authority to permit any other kind of rate, and, therefore, there never was a valid rate here. Therefore, the filed rate tariff doctrine doesn't apply. So your position is Congress would have to have affirmatively amended the Federal Power Act to permit deregulation? That's correct. Okay. Second, because there were no valid file rates, there's no preemption. And I think this Court's case of Ting establishes that. Because in Ting, what the Court held clearly, and I'll quote from it in a moment when I get to preemption, is that preemption flows from the filed rate. And here, if there was no valid filed rate, there can't be preemption, because in a preemption... If FERC were to say in the, which I guess they have, in FERC proceedings that the conduct of your client was unreasonable, wouldn't your argument be there, or at least on review of the FERC proceeding, that the rates were never valid in the first place? That's correct. That is our argument. And because the rates were never... It's your argument here, and it's your argument with respect to FERC punishing you for not filing reasonable rates as well. Well, I didn't file rates. Not charging. My client is not being punished or charged by FERC. That's the defendant's. Yeah. But I'd like to... It depends, but it would... That's right. I'm sorry. I just, they said it right the first time. But that still is going to have to be litigated in that, would be litigated in both forums, wouldn't it? It may be. But I think it's the authority and it's the responsibility of this Court and I think the Supreme Court cases we've cited are clear to decide whether there was a valid rate to begin with. What the courts have done, and I think there are three cases that are just right on point. It's the Massillon case, MCI v. AT&T, AT&T v. Central Office. The Court has over and over again said that the filed rate tariff doctrine is an exacting doctrine. It's a strict doctrine. If any element is not complied with, it doesn't exist. And I think it's pretty clear, if you look at what they did pre-regulation and post-regulation, that there was no compliance with 205. See, when you say post-regulation, it implies that FERC no longer monitors rates at all, that it doesn't insist, it has no duty to see that there's a fair and just rate. I didn't mean to imply that. I spoke too broadly. What I meant to say was post-market-based tariffs versus pre-market-based tariffs. But the reason I spoke up when you said that was that that, to me, does differentiate it from the telecommunications cases on which you may be relying, where they really did abandon rate regulation. Well, in this case, FERC hasn't abandoned some regulation. But what they did abandon is compliance with Section 205. What does 205 say exactly? Well, 205 says exactly, and I'm glad you asked that because that's where I was going, because it demonstrates what they used to do. They used to do under 205, because this is what FERC said it required. 205 says on its face that you must file your rates and schedules, rates and schedules. And they used to file under 18 CFR 3512. But it doesn't say when you file the rates. Yes, it does. You have to file the rates. There's a time frame in place. You can't actually impose the rate until FERC has signed off. So in the old, in the pre-market-based tariff, they had to file the rate and schedule, and they had to wait for FERC approval before those rates went into a force. And people were – I guess FERC's answer to that is that, well, it's a filed rate if you say that you are going to charge the market, you know, what buyers and sellers reach or something. That's what FERC has said, that the market-based tariffs to which you're referring constituted the tariff in effect. But FERC has no authority to say that what was filed complies with 205. Here's what was filed, a single sentence that says, all sales shall be made at rates established by agreement between the purchaser and defendant. Shall be made in the future. That is not rates that had been established, and the statute talks about rates. And every case that has ever come up before the Supreme Court has said over and over again that strict compliance with the filing requirement, with the filing requirement, is necessary before the file rate can come into effect. The FPA, again, going to Section 205C to answer your question, because I think it's an important point, it's the key point of our appeal, is that you, quote, must show all rates and charges. And they used to actually show you how they calculated the rates and charges and the cost basis. So, Mr. Berman, what's your measure of damages? My measure of damages, anticipating from your previous questions. It's a common theme. It's the following. First of all, no one has said this, but there's a period of time, and that's the period of time October 2000 to the early part of the case, about a six-month period, in which FERC has said there is no refund authority. So there will never be any FERC remedy for that period of time. Okay. Well, let's talk about the period where it occurs. Okay. But I don't want to lose that. I understand. I understand. But I still want to know how you determine what is owed your client based upon your theory that there was no valid rate in effect. We determined what is owed my client as we would in any normal antitrust case. We will put antitrust economists on the witness stand. To establish what would have been a just and reasonable rate. No. And the difference will be, the measure of damages will be the difference between that rate established by your experts and what your client actually paid. I respectfully beg to differ. What an antitrust economist will say, as they do in every case, is they will testify as to the but-for world what a price would have been without economic coercion or collusion. That's a different standard than just and unreasonable. I have never put antitrust economists on the stand and say what is a just and reasonable price. That is not their mission. Their mission is what would have been the price but for collusion. And it's different. It's different. As one court, I think it was Justice Scalia noted in the Electrical District No. 1 case, just and reasonable can mean a lot of things. It could be a range. A just and reasonable rate could be a range from $0.10 to $1. Well, this gets to be kind of circular. If what FERC has determined in the first instance is that just and reasonable means fair market, what the market would produce. Well, then you're getting into the issue, I think, of conflict preemption. And the cases there say, and this is where I think Judge Whaley also erred, there's three cases right on point, I think. The first is Otter Tail. The second is Honda. And the third is the California Supreme Court in Younger. And they all say that you have to have an actual conflict, not a potential conflict, not a hypothetical conflict. Right now, we don't have a conflict. It could be that when we go to trial, the trial judge will be presented with, Judge Whaley, I hope, will be presented with the issue of, well, FERC has done the following, and now you're asking Snohomish PUD for this, is there a conflict? We're not there yet. It could be that FERC does nothing. There would be no conflict, perhaps. And as I mentioned, there's a whole period of time in which the whole conflict issue can't possibly arise. The only defense to the filed rate tariff that we've heard from the other side is that these market-based tariffs that have this language, that we will establish a rate in the future, comply with Section 205C. And I submit to the Court that that can't possibly comply with the very strict requirements of 205C. The Supreme Court in Security Service v. Kmart, to cite another case on this point, said if you're missing even one element of a filed rate that's required by statute, that filed rate is invalid. So we have a situation here where we believe the judge erred because there were no filed rates, valid filed rates. What case was that again? That was Security Service v. Kmart, a 1994 Supreme Court case. Now, that takes me to preemption. We spent a lot of time in our brief talking about the legislative history of the Federal Power Act, the otter tail line of cases, whether Congress intended to occupy the field. And as I was getting ready for argument, I think that none of that this Court should have to reach, because there's a much easier answer and a correct answer, and that's the Ting case. The holding of Ting, we think, is dispositive of this preemption argument. In Ting, the Court, and I'm going to quote one sentence because I think it's the key sentence in the case, the preemptive effect of the filed rate tariff doctrine rests entirely on the filing requirement. And I repeat that, on the filing requirement. Now, the importance that we place on that is this. If there was no valid filing, which we believe is unquestionably the case here, there cannot be any preemptive effect. So why is that? Because, again, the inquiry for the Court on the issue of preemption is whether Congress intended to occupy the field. If Congress never intended that there would be a period of time where the electricity market operated without any valid rate, how could there be preemption? Well, but again, going back to Judge Canby's question, you're supposing that there's no oversight whatsoever by FERC with regard to the rates that are actually charged. And there clearly is, although it is now retrospective instead of prospective. But the issue here, in all due respect, is as to the issue of rates, I mean, what we're supposed to do is decide, did Congress intend to occupy the field? Let's assume that with respect to the setting of rates. Is there any dispute that Congress intended to occupy the field with regard to the setting of rates, which it gave to the Federal Energy Regulatory Commission? No. I don't think you dispute that. I don't dispute that. The question that we have to decide, I think, is whether or not permitting you to go forward with your antitrust claim is going to interfere with the congressional regulatory scheme. Is it going to adversely impact the ability of FERC to set wholesale power rates? Well, here's what FERC has said in the San Diego v. Sellers case. FERC has said that Congress never intended a market-based scenario. If Congress never intended a market-based scenario, then Congress could not have intended that there be preemption in this scenario. As this Court said in Ting, what we really have here is a deregulated market. And in a deregulated market environment, rather than a regulated file rate environment, state law complements, provides the necessary remedies. But under your theory of the case, FERC's existence post-deregulation is almost irrelevant. It sort of looks back on what the rates were charged without any impact on the setting of future rates. So FERC is still regulating, is still dealing with these companies on a going-forward basis, and it's still regulating. But since the whole scheme is operated in an area where Congress never intended FERC or these defendants to be ---- So by your theory, any refunds that FERC would order would be null and void, because it would be ordering refunds on the basis of rates that you say it never had the authority to enter. In essence, you're asking us, if we rule in your favor, you're asking us to declare that FERC, for all intents and purposes, is out of business. We don't need it anymore. No, I think FERC is still regulating these entities. But am I not correct that FERC would not have the authority, under your theory, to order refunds? Because it would be doing so on the basis of rates that it had no authority to approve. You know, that's a question I'm not in front of FERC, and I can't answer that. But I think the answer to that is yes. I think it would. It would be. I think that's the logical conclusion to your argument. And I agree. Okay. And the second part of my argument is that even if FERC does have authority, I think the cases are clear. There's a long line of cases which the defendants can't distinguish, starting with Otter Tail, and recently in FERC v. New York, a 2002 Supreme Court case in which FERC has said, excuse me, the Supreme Court has said that the FPA's existence did not preclude the applicability of the antitrust laws. So here's the Supreme Court of the United States saying the FPA's existence doesn't preclude the applicability of the antitrust laws. This is an antitrust case. And every Supreme Court case that has considered this issue has said that FPA was not intended to ---- Are you talking about state antitrust law? Well, there they're talking about federal antitrust law. But then there's a line of cases that we've cited, including the recent Seventh Circuit case in Panhandle, that says where federal and state laws complement each other, it would be illogical to conclude that Congress intended to allow federal antitrust laws to go forward and not state antitrust laws. And the Younger decision came out the same way. So in sum, and I'll save the remaining time for reply, there's two crucial points that I think we'd like to leave the Court with. Actually, three. First is there never was a valid rate as the statute prescribes. In the absence of a valid rate, there can't be a filed rate that provides a defense for this case. In the absence of a filed rate, if you file the Ting case, since we're in an area where Congress never intended for FERC or anyone to be, there can't be preemption. There may be two different regulatory schemes going on, or a regulatory scheme and a court scheme going on, but that was also permitted by the Otter Tail line of cases. And third, for that small period of time, but an important period of time, something that Judge Whaley just did not deal with, there is no FERC refund authority. There can't be the kind of conflict that you've been questioning me on. Thank you. Thank you. Good morning again, Your Honors. Terry Houlihan of Bingham & Kutchin for the Reliant Defendants. I plan to take 15 minutes this morning in this case on the filed rate doctrine and field preemption. Clifford Gunther of the Bracewell Patterson firm representing Power X will take five minutes on conflict preemption. Let me begin by saying that the district court correctly notes that defendants assert two related but separate grounds for dismissal. Filed rate and federal preemption both apply from a straightforward application of recent decisions of this court applying these doctrines to industries regulated by FERC. I refer to three cases, none of which I heard from the other side earlier. The Transmission Agency of Northern California v. Sierra Pacific Power Company, which I refer to as the tank case, Duke v. Davis, and County of Stanislaus v. PG&E. Collectively, these cases hold that federal law governs the operation of the wholesale electric power markets at issue here exclusively and that state law claims like the ones fled here are barred by the filed rate doctrine and are preempted. I think Tank, in particular, clarifies that the fact that there are market-based rates, which seems to be the primary argument asserted by the appellant, does not bar the application of the filed rate doctrine. In Tank, this court applied the filed rate doctrine to dismiss Tank's contract-related claims in spite of the fact that FERC did not, in that case, quote, address a specific allocation of, close quote, electricity or transmission capacity, 295F3 at 930. All FERC did was to approve the operation of a separate transmission line, there the Alturas Intertie, that, to the extent it was used, had the effect of reducing capacity available to the plaintiff on the interconnected Pacific Intertie. Referring to FERC Order 888, the court explained that, quote, the order regulates rates not by setting them directly but rather by setting rules requiring open access to transmission lines at uniform, openly disclosed rates. These open policies as to transmission capacity, FERC expects, will result in rates set at a competitive level. That appears at 295F3 at 930 to 31. Thus, the court applied the filed rate doctrine in Tank, even though it recognized that, under FERC Order 888, wholesale power rates were to be set by the market and recognized that the amount of transmission allocated, the specific disputed issue, would also be set by these market forces, which would determine how much the new intertie was used and how that use would affect the plaintiff's rights. The court similarly applied the filed rate doctrine in Duke, explicitly relying, in that case, on provisions of the California Power Exchange tariff as its basis. I refer you to 267F3 at 1046. So there you have a case of where the specific tariff involved in the claims asserted here was relied on by this court to apply the filed rate doctrine after the change to a market-based system. Consistent with Tank and Duke, the Supreme Court just last year, in Intergee, Louisiana, versus Louisiana Public Service Commission, upheld the application of the filed rate doctrine in a case under the Federal Power Act where FERC approved an arrangement that left the cost allocation issue there to the discretion of the company setting the rate and did not fix or publish a number in advance. Mr. Houlihan, is your response to Mr. Berman then that if his argument is correct, the Supreme Court would not have decided this most recent case that way? Because obviously they're assuming that the commission has the authority to set market-based rates. I believe that that's correct. Now, let me say that as a technical matter, in Intergee, the court was not addressing a market-based rate. It was addressing what it called a formula rate. If you look at 123 Supreme Court at 2054 note 3, it sets forth the formula limiting the committees of the discretion, the committee of the company that set the rates discretion. And what it said is that, quote, the operating committee's decision to consider an ERS unit to be available shall be based on consideration of current and future resource needs, the projected length of time the unit would be in this ERS status, the projected cost of maintaining such unit, and the projected cost of returning the unit to service. Close quote. That's it. That's the formula. It's not the kind of numerical cost-based rate filed in advance that plaintiff is describing is required by the Federal Power Act. I assume that the commission had to enter appropriate orders of approving the deregulation scheme that California in particular enacted. Was there any other authorization besides the commission's own? I guess it would be rulemaking. Well, I guess I would say yes in this sense. And I think it actually goes to the heart of the plaintiff's argument. You know, basically the argument is, well, wait a minute. The filed rate doctrine can't apply by a rate that merely says the rates are going to be set by the market. Well, that's not what the rate says. Plaintiff's complaint is limited to allegations of misconduct in, quote, by, close quote, the California Power Exchange and the California Independent System Operator. That's in his complaint ER002 at paragraph 2. FERC regulates these particular markets not only by means of the market rate tariffs issued to the defendants, but also by means of tariffs filed with FERC by the PX and ISO. As the court recognized in the California Power Exchange Court case, the PX operates pursuant to a FERC-approved tariff and FERC wholesale rate schedules. So FERC's action in accepting the PX and ISO tariffs and approving those tariffs which set out the way in which the market works were the way in which it approved the transfer in California to this different system. And if you look at the tariffs which we submitted as a part of the supplemental excerpts of record, boy, are they detailed. They're very elaborate. Among other things, they don't say that the seller sets the price at whatever he wants. The sellers submit bid curves of different amounts they would sell at different prices. The buyers submit similar curves. The PX and ISO set the price after analyzing all the bids. And then there are detailed provisions for how the price is adjusted. For example, just taking one market, the ISO imbalance energy market, there are two types of imbalance energy, instructed and uninstructed. If you look at SER 226, there are separate paragraphs describing the pricing of those two kinds of energy, including a formula that appears at SER 187. So these are very detailed tariffs, and the plaintiff's characterization of them is inadequate. The one thing that he said, though, of course, is it still doesn't give you a rate in advance. It does not. And I don't think that that is required under the Federal Power Act. No, I understand. I think that's really an issue in the other case that I referred to earlier, where there's an appeal of FERC's dismissal of the attorney general's case raising that question. But to me, the provision of the Federal Power Act that gives the FERC the authority to determine the timing of the filing is adequate to authorize this kind of arrangement under this detailed tariff. The farther you get from a sort of a pre-approved rate, the more the file-to-rate doctrine fades into a general preemption doctrine, which it's part of anyway. And the only usefulness, I suppose, of the file-to-rate doctrine as a separate instrument is in limiting the antitrust suits that are allowed to proceed but not to violate the file-to-rate doctrine. There are sort of two parts to your observation, and let me take them separately. It is the case that the file-to-rate doctrine, as applied at the state level, is a form of conflict preemption. But it is only- Or even failed preemption. I would call it a form of conflict preemption, because the rationale is that for a state to set or a court to set a different rate or to assume that a different rate would have prevailed is going to inevitably conflict with the rate approved by the agency. Or will be an obstacle to its accomplishing its purpose. And it would invade-it would-another part of the rationale is that-of the file-to-rate doctrine is that you want to protect the agency's jurisdiction to determine the rate, not have states interfere with it. I agree that that part of the rationale is kind of also a rationale for field preemption. And I think this is an area of field preemption. And you should make that clear as a part of your decision because it will eliminate a lot of the argument over the confines of the file-to-rate doctrine. If you just recognize that the field of wholesale power sales has been preempted, then we don't have to worry about the limits of the file-to-rate doctrine. But we'll decide that. But thank you for your suggestion. Ting is a different case under a different statute. We've briefed it. I think the differences are clear. To me, the remarkable thing that illustrates that is that Ting doesn't cite or discuss Tank or Duke. If we were dealing in the same ballpark, they would have had to distinguish and deal with those cases. The damages problem pointed out by Judge Tolman is a significant problem for the plaintiffs to proceed. They have to show that there is a different price by which to measure damages. That's precisely what the file-to-rate doctrine prohibits. It doesn't matter that the antitrust economist is going to say something other than what the just and reasonable rate is going to be. The fact is that under the doctrine, the only rate that they're entitled to is the just and reasonable rate. Are you intending to leave some time? Yes, five minutes for Mr. Gunter. Let me hit preemption. I get 15 this time. Let me mention that in Sales Hydro v. Maughan, 985 F. 2nd, 951, this court held that Part I of the Federal Power Act, in that Part I, Congress preempted the field of regulating FERC-licensed hydroelectric projects, with the exception of water rights issues. What's called for here is a similar explicit determination under Part II of the Federal Power Act. I think that Tank leads the way. In that case where the court dealt with state tort claims and disposed of them without discussing the file-to-rate doctrine at all in that section of the opinion, it reached the conclusion that those claims were barred without reference to the file-to-rate doctrine because of FERC's, quote, exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce, 295 F. 3rd at 928. That, to me, illustrates a recognition by this court of field preemption in this area. I'd like to finish by commenting on the otter tail California power, California VFC, FPC cases. The file-to-rate doctrine is a form of preemption. Its existence belies the notion that there's some general exception to preemption for state antitrust and unfair competition laws, obviously to the extent the file-to-rate doctrine applies, state antitrust is preempted. Second, otter tail's not a preemption case. Whereas in this industry there's a bright line easily ascertained, according to the Supreme Court, between the area in which state law is preempted and the area governed by federal law, I submit that state antitrust law should be preempted even where federal law would be allowed. If there is field preemption, as the Supreme Court held there was under the Natural Gas Act in Schneiderwind 485 U.S. 293, that means the state antitrust law is out. The question of how you accommodate federal law with federal regulatory systems is a different question. All right. We understand your point. You are into your colleague's time now. May it please the Court, I'm Cliff Gunter, to talk strictly about the issue of conflict preemption and discuss what's going on at the Federal Energy Regulatory Commission as we speak today. There is the refund proceeding, which in our view, in my opinion, the relief sought by the plaintiff directly conflicts with the refund proceeding. FERC is looking at the rates that were charged, the market-based rates that were charged, has set up a proxy rate that I guess maybe some antitrust economists can call it something else, but it is in fact the difference between a rate and the market-based rates and has ordered those refunds. What is the status of that? The hearings are ongoing with respect. I believe, Your Honor, and I'm not sure of this, but I believe $100 million of refunds have been ordered so far and they're working on it. They've set the rate for each hour during the period involved, which is no small task, and the hearings are being conducted to determine precise quantifications of those refunds. So it is an ongoing proceeding. There is also a turning to the injunctive relief sought by the plaintiff in this matter here, the Snohomish case. The plaintiff seeks an injunction, which in my opinion, in our opinion, would require the trial court to take a look at the tariffs that Mr. Houlihan talked about. All of the acts of the defendants make a determination as to whether some acts were lawful, some acts were allegedly unlawful, and then fashion a remedy, which is exactly what FERC is doing in the gaming, bidding, and alliance investigations that are going on right now. Gaming looks at the period of a few months where FERC has no refund authority. Well, FERC has no refund authority because Congress gave it no refund authority. That is a decision by Congress as to how the Federal Energy Regulatory Commission acts with refunds of rates. That is a congressional issue right there. And a decision by FERC or Congress not to act in an area is, in fact, a decision by the regulatory body. I don't know how you get around, and I'll wrap this up rather quickly, but I don't know how the plaintiff or this court can get around the fact that the relief sought in this case directly conflicts. As the United States Supreme Court said in the Geier case, the fact, that's the airbag case, the fact that the no airbag lawsuit is extant does, in fact, conflict with the jurisdiction and relief and authority of the Federal Energy Regulatory Commission in our case. And I'll be glad to answer any questions on it, but I don't want to prolong this any more than we need to. Thank you. Thank you. May it please the Court. Counsel suggested that there were detailed tariffs that had been filed. He said they were voluminous. They were filed by the ISO and the PX. And the Kmart case, which I cited to you, says you can't rely on someone else. It has to be your filing. And more importantly, FERC has said that those filings were not the filed rate. In San Diego Gas and Electric, FERC said that the filings were the market-based one-sentence expectation, we will enter into a contract in the future. So the agency itself has rejected what they're trying to rely on for the filed rate and why they're trying to rely on that is they know they haven't filed a valid rate here. The cases they've cited, the Entergy case, the Duke case, and the Tank case, those are all cases, and there's a long line of these cases where either governmental officials or utility commission folks have directly regulated what FERC has regulated. That's not this case. And, in fact, in Tank, Congress had made a special authorization, which allowed for the intertie type of arrangement that was at issue there. Here Congress has made an express statement. It told FERC that you must have rates that are pre-approved. The rates have to be specific. They have to set forth the basis for calculating the rate. That wasn't complied with here, so Tank is not on point. As for the conflict that counsel just raised, I'll cite one of their own cases, the Schneiderwin case. Quote, State law is preempted when it actually conflicts with Federal law, and the cases have said you have to wait for the actual conflict. There is no conflict yet, so we submit it would not be correct to dismiss this case on conflict preemption based on some potential conflict. In conclusion, I've made this point repeatedly. I'm going to stand and fall by this point. No court, except for Judge Whaley, has ever, ever, and there have been dozens of cases over decades on the filed rate tariff doctrine, applied the filed rate tariff doctrine, which the Supreme Court has recognized to be a harsh rate or a harsh remedy in certain circumstances, where there's never been a valid rate filed.  Thank you, Your Honors. Thank you, counsel. The matter just argued is submitted for decision. That concludes the court's calendar for this morning. Court stands adjourned. All rise. This court will be set in ten minutes. Yeah. Thank you.
judges: Schroeder, Canby, Tallman